AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of Colorado

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| 69300 Orion Trail, Montrose, CO, more fully described in Attachment A | ) ) ) |

Case No.20-sw-00657-GPG

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment (A) attached hereto and hereby incorporated by reference.

located in the _____State and_____ District of _____Colorado_____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment (B) attached hereto and hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute |

The application is based on these facts:
See attached affidavit of TFO Blake McClellan

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____s/ Blake McClellan_____
*Applicant's  signature*

_____Blake McClellan, Task Force Officer_____
*Printed name and title*

Sworn to and signed by realiable electronic means.

Date: _____5/29/20_____

City and state:  Grand Junction, CO

_____
*Judge's signature*

_____Gordon P. Gallagher, U.S. Magistrate Judge_____
*Printed name and title*

## AFFIDAVIT

I, Blake McClellan, a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA), being duly sworn, do hereby depose and state as follows:

## AFFIANT'S BACKGROUND

1.      I am an "investigative or law enforcement officer" within the meaning of Section 2510(7) of Title 18, United States Code, and am authorized by law to conduct investigations and make arrests for offenses in Title 18, United States Code, Section 2516.

2.      I am currently employed by the Mesa County Sheriff's Office as an Investigator assigned to the Western Colorado Drug Task Force (WCDTF) and was so at all times relevant to the facts contained herein.  I have been employed as a sworn peace officer for over twenty-two years and was assigned to the WCDTF in November 2012.  The primary function of the WCDTF is to investigate drug organizations.  In November 2014, I was assigned to the DEA as a federally deputized Task Force Officer.  All of the information herein contained was compiled by me in the course of a criminal investigation, including speaking with fellow law enforcement officers and named citizens.

3.      I have personally written and served numerous search warrants for residences, computers, vehicles, and other items used in the trafficking of controlled substances; written arrest affidavits for persons suspected of trafficking controlled substances; interviewed numerous persons about the use and distribution of controlled substances; written affidavits for the interception of telephonic communication; and completed investigations into money laundering and financial crimes.  As a result of this experience, I am familiar with the ways in which controlled substance traffickers conduct business, including but not limited to, methods of importing, manufacturing and distributing controlled substances; methods of laundering the

profits gleaned from the sales of controlled substances; and the use of telephonic devices and other telecommunications methods to conduct transactions.

4.      Based on my experience, training, and discussions with other law enforcement officers experienced in drug investigations, I know that certain indicators exist when persons use residential homes for cultivating marijuana.  Indicators for homes that contain marijuana grows include, but are not limited to, the following:

a.      Homes used to grow marijuana are outfitted with dozens of high output lights and ballasts.  These lights create the artificial light that allows the process of photosynthesis to occur and the marijuana plants to grow.  These lights use large amounts of electricity each month and can be on for up to 24 hours a day.  The US Energy Information Administration (EIA) collects and records average household electrical usage in the United States.  During 2017, the EIA reported the average monthly electrical usage for Colorado households was 678 Kilowatts (kW).  I know from training and experience that typical homes use 500 to 1500 kW of electricity per month.  Electrical usage in excess of 1,500 kW per month is a very good indicator that the home is being used to grow marijuana.  There are few reasons that can account for large amounts of electrical consumption in residential homes, other than the use of high output lights and ballasts found in marijuana grows.

b.      Many residential marijuana grow homes are not occupied.  The heat and humidity from the marijuana grow and the use of chemicals make the homes uncomfortable to be in for long periods of time.  The growers will come to harvest the marijuana or tend to the marijuana grow every few days.  I know that conducting surveillance on homes and establishing that they are not being lived in is an indicator

they are used to grow marijuana.  This is especially true when seeing elevated levels of electrical consumption at homes surveillance has established as being unoccupied, or only visited infrequently.

c.    Because many marijuana grow homes are often unoccupied, I know the homes seldom contain items of evidentiary value other than the marijuana plants and growing equipment.  The marijuana growers know the homes may be the target of law enforcement search warrants, or robbery and theft.  As a result, the growers will often keep finished marijuana product, money from the illicit sale of marijuana, and documents related to the criminal enterprise at other locations that do not contain a marijuana grow.

d.    The odor of marijuana at a home is a good indicator that the home is being used to grow marijuana plants.  Many residential marijuana grows will have the strong odor of marijuana that is easily detected from outside the home.  However, I also know from training and experience that great lengths are taken to construct marijuana grows so that the odor of marijuana is contained or hidden.  This is done by using construction techniques to seal rooms making them air tight, using large commercial filters to remove the odor of marijuana, and using timers so the grow is vented when it is less likely to be detected by neighbors and law enforcement.  These methods are often very effective at preventing the odor of marijuana from being detected outside the home.

5.    During the course of my participation in numerous investigations, I have used a variety of investigative techniques and resources, including physical and electronic surveillance and various types of informants and cooperating sources.  Because of these investigations, training and experience, and conversations with other agents and law enforcement personnel, I have become familiar with the methods used by traffickers to: smuggle and safeguard controlled

substances, distribute controlled substances, and collect and launder the proceeds generated by their sale, manufacture and distribution.  In addition, I have learned that drug traffickers use various types of electronic communication devices to code, encrypt, conceal and maintain records in order to facilitate their trafficking activities.  Through all of this training and experience I have further learned:

      a.     That persons involved in large scale drug trafficking conceal, in various locations, caches of drugs, drug paraphernalia, deeds to property, and other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money acquired from drug trafficking activities.

      b.     That drug traffickers often maintain (in either physical or electronic format): negotiable monetary instruments, transaction ledgers, U.S. currency, electronic currency (Bitcoin, etc.), controlled substance supplier lists, correspondence, drug related notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when controlled substances were obtained, transferred, sold, distributed, and/or concealed.  I have further learned that drug traffickers also maintain drug paraphernalia such as weighing devices, marijuana cultivation paraphernalia, miscellaneous containers, and measuring devices, which are used to facilitate the distribution and/or consumption of controlled substances.

      c.     That drug traffickers earn large sums of money and often try to legitimize these large sums of money.  In order to do this, drug traffickers attempt to secret, transfer, and conceal the illicit money by 1) placing assets in names other than their own to avoid detection while maintaining control; 2) hiding the money (and related documents) in

businesses, safes, and associated bank accounts and safe deposit boxes; 3) using the money to buy assets that are difficult to trace; 4) depositing and commingling drug proceeds with legitimate funds in an effort to conceal the drug proceeds.

d.      That drug traffickers engaged in money laundering frequently retain records of their transactions within their places of business.  These records may be in the form of written notes and correspondence, receipts, negotiated instruments, contracts, bank statements, electronic communications and other records.

e.      That drug traffickers engaged in money laundering often maintain such records for long periods of time, particularly when they are involved in ongoing criminal conduct over a long period of time.

f.      There are many reasons why drug traffickers maintain evidence for long periods of time.  The evidence may be innocuous at first glance (e.g. financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials, computer hardware and software), but have significance and relevance when considered in light of other evidence.  The drug trafficker may no longer realize he/she still possesses the evidence or may believe law enforcement could not obtain a search warrant to seize the evidence.  The drug trafficker may also be under the mistaken belief that he/she has deleted, hidden or further destroyed any computer related evidence.  However, that evidence may still be retrievable by a trained forensic computer expert.

g.      Net worth / source and application of funds analyses can often show that a suspect's known expenditures and/or accumulation of assets substantially exceeds his or her legitimate sources of income, thus providing evidence that the suspect is engaged in illegal activities (such as drug trafficking or fraud) which result in the generation of monetary proceeds.  The net worth analysis compares a suspect's net worth (cost value of total assets minus total liabilities) at a time just before the suspect has commenced his purported criminal enterprise, with his/her net worth at the approximate time of his/her arrest (and potentially at intervals in the interim).  The source and application of funds analysis focuses on the suspect's expenditures during the time period of the purported illegal activities and compares such expenditures with his/her legitimate sources of income.  Both analyses require evaluation of bank records, credit records, loan records, documents evidencing ownership of assets, and other documents evidencing the financial profile of the suspect during the course of the purported illegal activity, as well as a short time period prior to the illegal activity (e.g., one year).  Such analysis evidences changes in lifestyle, asset accumulation, and expenditures between the time period prior to the illegal activity and the time period of the illegal activity.  This can provide evidence of profit-generating illegal activities (e.g., drug trafficking or fraud), as compared to a person earning income from legitimate sources.  Evidence of a defendant's expenditures, asset accumulation, financial lifestyle, net worth/source and application of funds analyses, and underlying financial documents necessary for such analyses are admissible evidence under federal case law in drug trafficking and money laundering cases.  This establishes the need for such documents to be taken during the execution of a search warrant.

h.      Drug traffickers are not unlike other members of society in that they rely on credit and debit cards to make financial payments.  Records relating to the use of such cards can provide valuable information to the investigation by establishing the amount of money that is being spent by the suspects, and it may further identify businesses which are associated with the illegal activities of the suspects.

i.      Drug traffickers deal in currency and store currency in conveyances, homes, safe deposit boxes, safes and at business sites to conduct transactions. Furthermore, the Currency Transaction Report (CTR) (IRS Form 4789) is required to be completed and filed with the Internal Revenue Service by all financial institutions on every currency transaction that exceeds $10,000.  This requirement causes tremendous problems for drug traffickers when they attempt to negotiate their illegal profits at financial institutions because these reports can be made available to law enforcement officials.  It is quite common for individuals who deal in illegal controlled substances to convert drug proceeds (currency) into cashier's checks or money orders in amounts less than $10,000 at numerous financial institutions over the course of several days in order to avoid the CTR filing requirement.  Furthermore, drug traffickers often recruit other individuals to convert drug proceed currency for them in order to avoid handling the currency themselves.  Finally, it is not uncommon for drug traffickers to endeavor to circumvent these requirements and "legitimize" their funds through casinos, documenting their "winnings" in an attempt to show an additional source of income.

j.      Drug traffickers also use financial habits designed to minimize and hide a paper trail.  Traffickers often purchase and/or title their assets in fictitious names, aliases, or in the names of relatives, friends, associates or business entities to avoid detection of

these assets by government agencies, especially the Internal Revenue Service.
Regardless of documented ownership, the drug traffickers continue to use these assets
and exercise control over them.

k.     Individuals who deal in illegal controlled substances take, or cause to be
taken, photographs of themselves, their associates, their property and their illegal
product.  These individuals usually maintain these photographs in their possession or in
businesses such as dispensaries where they have access and control.  Locations related to
the cultivation and distribution of illegal marijuana often maintain surveillance systems to
monitor and protect grow sites, which frequently store and maintain evidence of ongoing
illegal activity and criminal associations.

l.     Drug traffickers often engage in domestic and/or international travel in
relation to the smuggling of illegal contraband.  Specifically, subjects of this investigation
are of Chinese descent and engage in interstate or international travel for purposes of
obtaining supplies, smuggling bulk currency out of the United States, distributing their
product and/or speaking with investors and associates.  Analysis of travel records can
reveal other locations related to the distribution of illegal drugs or the payment of related
proceeds.  Furthermore, evidence of travel can also assist in the identification of assets
and/or monetary expenditures associated with the illegal proceeds of drug transactions.

6.     The information contained within this affidavit is based on my training and
experience, as well as information imparted to me by other law enforcement officers involved in
this investigation.  Because this affidavit is being submitted for the limited purpose of securing a
search warrant, each and every fact known concerning this investigation has not been included.
This document contains only the facts believed necessary to establish probable cause that

evidence, fruits and instrumentalities of violations of Title 21, United States Code, Section 841(a)(1), as specified in Attachment B of this affidavit, are located at the TARGET LOCATIONS described in Attachment A of this affidavit.

## PROBABLE CAUSE

7.      In December of 2019, the Drug Enforcement Administration (DEA) began an investigation into the Tony WU Drug Trafficking Organization.  Through physical surveillance, GPS tracking devices, open records searches, and analyzing electrical consumption records, investigators learned Tony WU and his wife, Moon WU, are operating marijuana grows at 23404 V66 Trail Montrose, Colorado (TARGET LOCATION ONE); 69300 Orion Trail Montrose, Colorado (TARGET LOCATION TWO); and 69306 Orion Trail Montrose, Colorado (TARGET LOCATION THREE).  Tony WU and Moon WU's primary residence is 23404 V66 Trail Montrose, Colorado (TARGET LOCATION ONE).  As documented below, Tony WU and Moon WU frequently go to each of these locations, where they likely tend to the marijuana plants.

### A.  TARGET LOCATIONS

8.      **TARGET LOCATION ONE - 23404 V66 Trail, Montrose, Colorado**, is a single-family residence in a rural area.  Montrose County Assessor records list the owner as Tony WU.  The Delta-Montrose Electric Association (DMEA) provides electrical service to this address.  The DMEA account holder for TARGET LOCATION ONE, is Tony WU.  WU has been the account holder since January of 2017.  Records from DMEA for the September 2019 to January 13, 2020 billing cycle show TARGET LOCATION ONE used 33,190 kW of electricity.  Between September 1, 2019 and December 2019, the average monthly electrical usage at TARGET LOCATION ONE was 8,297 kW.  In February 2020, the electrical usage was 15,010

kW.  In March 2020, the electrical usage was 14,159 kW.  In April 2020, the electrical usage was

10,685 kW, and in May 2020, electrical usage was 5,039 kW.   Based on the elevated electrical

usage and further information detailed below, I believe TARGET LOCATION ONE has been

and continues to be utilized to cultivate marijuana in violation of Title 21, United States Code,

Section 841(a)(1).

9.      **TARGET LOCATION TWO - 69300 Orion Trail, Montrose, Colorado**, is a

single-family residence in a rural area.  Montrose County Assessor records list the owner as

Tony WU.  DMEA provides electrical service to this address.  The DMEA account holder for

TARGET LOCATION TWO, is Tony WU.  WU has been the account holder since April 2016.

Records from DMEA for the September 2019 to December 2019 billing cycle show TARGET

LOCATION TWO used 4,268 kW of electricity.  Between September 2019 and December 2019,

the average monthly electrical usage at TARGET LOCATION TWO was 1,069 kW.  This

average is in line with average electrical use, but there are some irregularities.  In September

2019 the electrical usage was 8 kW.  In October 2019 the electrical usage was 430 kW.  In

November 2019 the electrical usage was 1,816 kW.  In December 2019 the electrical usage was

2,014 kW.  The electrical usage has steadily increased at the residence over the past several

months and based on surveillance of the residence it does not appear that anyone actually lives in

the residence.  In February 2020, the electrical usage was 2,854 kW.  In March 2020, the

electrical usage was 5,424 kW.  In April 2020, the electrical usage was 6,023 kW, and in May

2020, electrical usage was 3,381 kW.  Based on the increasing electrical usage, and further

information detailed below, I believe TARGET LOCATION TWO has been and continues to be

utilized to cultivate marijuana in violation of Title 21, United States Code, Section 841(a)(1).

10.      **TARGET LOCATION THREE - 69306 Orion Trail, Montrose, Colorado**, is a single wide mobile home in a rural area.  Montrose County Assessor records list the owner as Tony WU.  DMEA provides electrical service to this address.  The DMEA account holder for TARGET LOCATION THREE, is Tony WU.  WU has been the account holder since May 2018. Records from DMEA for the September to January 2020 billing cycle show TARGET LOCATION THREE used 14,142 kW of electricity.  Between September 2019 and January 2020, the average monthly electrical usage at TARGET LOCATION THREE was 2,828 kW. Based on my training and experience, this means TARGET LOCATION THREE was using on average twice as much electricity as a comparable sized home.  There are also some irregularities with the electrical usage at this residence.  In September 2019, the electrical usage was 15 kW. In October 2019, the electrical usage was 14 kW.  In November 2019, the electrical usage was 482 kW.  In December 2019, the electrical usage was 5,266 kW, and in January of 2020 the electrical usage was 8,365 kW.  The electrical usage has remained elevated.  In February 2020, the electrical usage was 10,829 kW.  In March 2020, the electrical usage was 9,508 kW.  In April 2020, the electrical usage was 7,692 kW, and in May of 2020, the electrical usage was 8,788 kW. Based on surveillance of this location, it does not appear that anyone actually lives in the single wide trailer on the property.  Based on the increasing electrical usage, and further information detailed below, I believe TARGET LOCATION THREE has been and continues to be utilized to cultivate marijuana in violation of Title 21, United States Code, Section 841(a)(1).

B.  <u>SURVEILLANCE AT TARGET LOCATIONS</u>

11.      On December 4, 2019, Colorado Bureau of Investigation (CBI) Agent in Charge (AIC) Jim Fuller and CBI Agents Travis Peck and Joseph Farmer, conducted open field surveillance near TARGET LOCATION ONE.  CBI Agent Jeff Brown transported AIC Fuller,

Agent Peck and Agent Farmer to the location.  While Agent Brown was driving to the location,

he observed a red Toyota Tundra bearing Colorado license plate GOY189, near the intersection

of the Highway 550 frontage road and Government Springs Road.  The red Toyota Tundra is

registered to Tony Wu, at TARGET LOCATION ONE.  As CBI Agents passed the driveway to

the property, they observed a green metal gate across the driveway entrance.  There were two

brown metal posts on the north side, and one brown metal post on the south side.  The posts on

the north side had recently been placed in concrete and there was a small black solar panel on the

north post, indicating that the gate could be opened remotely.  The address numbers 23404, were

posted on the south post.

12.     Agent Brown dropped AIC Fuller, Agent Peck and Agent Farmer off near

TARGET LOCATION ONE.  While conducting surveillance they observed a driveway that is

approximately seven-hundred feet long, leading from the roadway to TARGET LOCATION

ONE.  While AIC Fuller, Agent Peck and Agent Farmer were standing to the south of the

residence, they were able to smell a strong odor of raw marijuana.  There is a single wide mobile

home on the property with the main door facing southwest.  There were multiple vents on the

roof of the mobile home, primarily on the south end.  There is a stick framed addition that has

been built onto the mobile home's east side.  The windows on the east side of the mobile home

and all windows in the addition were covered with a white material, blocking any view into the

structure.  There is a large, stand alone, electrical box to the southwest of the mobile home.

13.     To the south side of the mobile home there is a large fenced area, which has a

fence post approximately every six feet.  The fenced area extends from the southwest corner of

the mobile home, back up north to the northeast side of a large metal pole barn, which is located

to the northeast of the mobile home.  The fenced area is divided in half with a metal fence, which

extends from east to west, and divides the fenced area into a southern half and northern half. The exterior perimeter of the fence is a green material, which helps to obscure the view of anything contained inside of it. There is a large water tank inside the southern portion of the fenced area, which was on the east side. It appeared to AIC Fuller and Agents Peck and Farmer that the southern portion of the fenced area was likely used for an outdoor marijuana grow in the past. The north side of the fenced area has gravel in it and contains the addition that has been built onto the mobile home, and a portion of the metal pole barn. To the east of the northern half of the fenced area, outside of the fence next to a cedar tree, there was a large pile of soil and plant stalks. Several clumps of soil in the pile were still in the shape of plant pots. There is a small breezeway that has been built connecting the addition and the mobile home to the metal pole barn. The metal pole barn appears to be approximately 40 feet long by 30 feet wide. There is a pipe, which appears to be a gas line, on the southeast side of the metal pole barn. There are two windows on the east side of the metal pole barn, both of which were covered, blocking any view into the building. Both windows on the east side of the metal pole barn have large vent pipes sticking out of them. Each vent pipe appears to be approximately 8" to 10" in diameter, and are the type of vents, based on my training and experience, that are commonly used to vent buildings where marijuana is being grown. The vents are on the east side of the metal pole barn, which is the side of the building least visible from the driveway or the front of the mobile home. There is also another water tank located outside the northeast corner of the metal pole barn. The water tank is also placed in an area, where it is the least visible from the driveway and front of the mobile home. There was a large, white metal storage container, located to the north of the metal pole barn.

14.     The odor of raw marijuana, the excessive number of vents on the roof of the mobile home, all of the windows being covered with a white material, venting in the windows on the east side of the metal pole barn, the large amount of discarded soil and stalks which appear to be from past marijuana grows, the large water tanks in and near the fenced area, the large power box, and the white metal storage container box are all indicators of an illegal marijuana grow.

15.     On December 9, 2019, TFO Rich Tifft, Agent Peck and AIC Fuller, responded to TARGET LOCATION ONE and again conducted surveillance of the property.  TFO Tifft and AIC Fuller walked through an open field and were approximately 200 yards northeast from WU's property.

16.     TFO Tifft observed the red Toyota Tundra parked in the open carport and was able to confirm the front license plate (CO GOY189) by utilizing high power, magnified optics. There is a small breezeway between the mobile home and the metal pole barn that TFO Tifft was able to see a large quantity of potting soil, stacked up against the southern exterior wall of the pole barn.  TFO Tifft and AIC Fuller observed Tony WU and an unknown female (believed to be Moon WU), get into WU's Toyota Tundra, and drive down the driveway.  A short time later, TFO Tifft observed the truck turn around and pull back into the carport.  TFO Tifft and AIC Fuller observed Tony WU get out of the truck and go into the metal pole barn, which is the site of the suspected marijuana grow.  WU returned with a plastic grocery bag with unknown contents.  TFO Tifft observed WU place the bag into the back seat of the truck, then go into the mobile home.  About one minute later, WU came out of the mobile home carrying something wrapped in a blue towel.  WU placed the object into the back seat of the truck, then WU and the female left the property.  Agent Peck followed WU and the unknown female to TARGET LOCATION TWO.

17.     On December 31, 2019, AIC Fuller, Agent Peck and TFOs Ben Russell and Tifft were conducting surveillance at TARGET LOCATION ONE.  They observed a male, matching the description of Tony WU, leave the address in WU's Toyota Tundra.  A short time later, AIC Fuller, Agent Peck and TFOs Tifft, and Russell, went to the area of TARGET LOCATION TWO and THREE.

18.     While conducting surveillance they observed the windows in the house at TARGET LOCATION TWO were all covered, blocking light and preventing any view into the structure.  There was the frame of a small hoop house located near the main residence, as well as a detached building beside the main residence.  At the time there were no vehicles parked near TARGET LOCATION TWO.

19.     AIC Fuller, Agent Peck and TFOs Tifft, and Russell, continued southeast of the properties and conducted open field surveillance near TARGET LOCATION THREE.  While conducting surveillance they observed WU's Toyota Tundra parked near the residence.  There is a single wide mobile home on the property, with an attached addition on the south side that is partially enclosed, and an attached addition on the north side that is fully enclosed.  There was also a large red Conex box located east of the residence.

20.     The attached enclosed addition, located on the north side of the mobile home, is enclosed with plywood and does not appear to be finished.  There are no windows in the addition.  Near the south door of the attached enclosed addition, there were several large black trash bags, a black plastic planter pot and a white five-gallon bucket.  On the east side of the enclosed addition there were multiple black plastic planter pots.

21.     Near the front door, under the roof of the addition on the south side of the residence, there were multiple galvanized steel wire tomato cages, and a bag of potting soil.

These items are commonly used in the cultivation of marijuana.  The roof for the single wide mobile home is white in color and the roofs for the attached additions of the residence are red. There was still snow on the roof of the addition on the south side of the mobile home and noticeably less snow on the addition on the north side.  This is possibly an indication of a heat source within the addition on the north side.  Based on my training and experience indoor marijuana grows have to maintain warmer consistent temperatures in order for the marijuana plants to live and grow.

22.    On January 27, 2020, Agent Peck was conducting surveillance at TARGET LOCATION TWO.  Agent Peck observed Tony WU's Toyota Tundra leave the residence.  The Toyota Tundra was followed to Centennial Middle School, in Montrose, Colorado.  Agent Peck was able to identify WU as the driver and sole occupant of the vehicle.

23.    On May 14, 2020, members of the DEA Grand Junction office, agents from CBI, and I conducted surveillance of TARGET LOCATION ONE.  I noted the presence of window coverings and window vents in the shop on the north side of the residence, indicative of an indoor marijuana grow operation.  Although I could not hear the sound of related equipment or smell the odor of marijuana at the time, the persistent elevated electrical usage demonstrates that the marijuana grow remained in operation.  I also noted indications of historical marijuana grow activity, such as a large pile of what appeared to be root balls from large plant pots, and outdoor irrigation equipment, but no other evidence of a current outdoor marijuana grow operation.

24.    At the same time, DEA Special Agent Greenfield and other members of the DEA Montrose POD and CBI were conducting surveillance of TARGET LOCATIONS TWO AND THREE.  Previously observed window coverings at these locations remained in place. Surveillance did not observe any audible sound of equipment used in marijuana cultivation or the

detectible odor of marijuana during this surveillance.  However, the continued excessive electrical usage at these locations demonstrate that they remain active locations for marijuana cultivation.

### C.  SURVEILLANCE OF TONY WU TO DENVER METRO AREA

25.     On January 14, 2020, Agent Farmer obtained a GPS tracker warrant signed by Montrose County Court Judge Bennet Morris, which allowed a GPS unit to be installed on Tony WU's Toyota Tundra.   The following day, agents followed WU from his residence at TARGET LOCATION ONE to his properties on Orion Trail (TARGET LOCATIONS TWO AND THREE).  TFOs Tifft and Russell were able to attach the GPS tracker to WU's Toyota Tundra while it was parked outside the mobile home located at TARGET LOCATION THREE.  While TFOs Tifft and Russell were outside the mobile home, they were able to smell the strong odor of raw marijuana, and hear what they believed to be electric fans running inside the mobile home.

26.     On January 20, 2020, data from the GPS tracker indicated the Toyota Tundra had left Montrose, Colorado, and was driving through Grand Junction, Colorado.  TFO Tifft and TFO Russell established surveillance on the vehicle and followed it to the Denver metro area. The vehicle traveled to a strip mall with several businesses on Hampden Avenue in Denver.  WU was identified as the driver and sole occupant of the vehicle.

27.     TFO Russell observed WU park and go into "Potting Garden Supply".  He was inside for a few minutes, then exited the store and got into his truck.  An Asian male with a shaved head followed WU out of Potting Garden Supply and walked to another storefront in the strip mall called "Salon International." The bald Asian male used keys to open the door of Salon International and went inside.  Salon International is two doors to the west of Potting Garden Supply.  Salon International appeared to be closed for business as items inside the store were boxed up.

28.     WU drove his truck around to the back of the strip mall.  TFO Tifft observed WU

carry a duffle bag and backpack into the back door of Potting Garden Supply.  At approximately

this same time, TFO Tifft observed a bald Asian male exit the back door of Salon International.

The male went to the cargo area of a black BMW SUV and removed a cardboard Home Depot

box and carried it into the back door of Salon International.  The male came back out and

retrieved a second cardboard Home Depot box from the BMW SUV and carried this box into the

back door of Salon International.

29.     TFO Tifft observed the bald Asian male exit the back door of Salon International

carrying one Home Depot box, which he placed into the BMW.  The BMW left and TFO Russell

confirmed the male driver was the same Asian male that he had observed unlocking the front

door of Salon International.  TFO Tifft observed WU and an Asian male in a black down jacket

come out the back door of Potting Garden Supply.  WU opened the truck topper of his Tundra

and removed one full black trash bag and then they took the trash bag into the back door of Salon

International.  WU then retrieved a second black trash bag, which appeared to be full, and carried

it into the back door of Salon International.

30.     Later, TFO Tifft observed a black Mercedes SUV back up to back door of Salon

International.  The Mercedes was only there for a few seconds and TFO Tifft was not able to see

if anything was placed into the SUV or if anyone exited the SUV or store.  The SUV then left.

31.     TFO Russell observed WU exit the back door of Salon International carrying two

black trash bags that appeared full.  WU placed the bags into the back of this Toyota Tundra and

went into the back door of Potting Garden Supply.  At this time, TFO Tifft got out on foot and

walked past WU's Toyota Tundra.  TFO Tifft looked into the back of WU's Toyota Tundra,

which is covered by a truck topper, and he observed the two black trash bags and one plastic

grocery bag that looked full.  Agent Tifft could smell the odor of raw marijuana coming from the

back of WU's truck.  WU, the male in the down jacket and a 3rd Asian male, then exited the back

door of Potting Garden Supply.  The men were pushing a cart with fertilizer jugs and boxes, all

of which were placed into WU's Toyota Tundra.  WU left and TFOs Tifft and Russell followed

him out of Denver.  GPS data showed he drove back to Grand Junction, where he stopped for an

hour at a residence.  WU then drove back to his residence at TARGET LOCATION ONE.

32.    It is unknown if the black trash bags he was observed placing in his truck were the

same bags he previously took into Salon International.  Based on these observations, agents

believe WU travelled to this location to complete a marijuana transaction, but it did not take

place for unknown reasons, and the marijuana was being returned to WU.  It is also believed that

WU picked up additional growing supplies for his marijuana grow operations in Montrose,

Colorado.

## D.  GPS TRACKERS AT TARGET LOCATIONS

33.    Pursuant to court orders, Tony WU's red Toyota Tundra was subject to GPS

monitoring between January 15, 2020, and February 3, 2020.  During this time, GPS tracking

data showed the Toyota Tundra drove between TARGET LOCATIONS ONE, TWO and

THREE, on a daily basis.  WU's Toyota Tundra returned to TARGET LOCATION ONE each

day and would remain there overnight.

34.    Between January 15, 2020, and January 27, 2020, WU's Toyota Tundra drove

from his residence (TARGET LOCATION ONE) to TARGET LOCATION TWO and THREE

every day except for January 20, 2020, the day WU drove to the Denver metro area.  WU's

Toyota Tundra was often at TARGET LOCATION TWO and THREE for several hours or more.

35.    The GPS data from the Toyota Tundra supports that TARGET LOCATIONS

TWO and THREE are marijuana grows operated by WU, or are locations where evidence will likely be found related to the conspiracy.

      a.    Based on training and experience, I know it is common for marijuana cultivators to frequently work in their marijuana grows.  They are often trimming plants, watering, harvesting marijuana or planting new crops.  The GPS data from the red Toyota Tundra indicates this vehicle travels between the TARGET LOCATIONS on a daily basis.

      b.    In addition, I know from training and experience that marijuana cultivators seldom keep finished marijuana product or other items of evidence at unoccupied marijuana grow homes.  These items are often taken to locations that are occupied or that do not contain illegal marijuana grows and are less likely to be searched by law enforcement or subject to robbery/theft from other rival criminal groups.  GPS data from the Toyota Tundra shows this vehicle spends the night at TARGET LOCATION ONE, indicating this is WU's primary residence.  GPS data also shows the truck commonly travels between TARGET LOCATIONS TWO and THREE and then back to TARGET LOCATION ONE.  This activity supports that items of evidence, along with an illegal marijuana grow, will likely be found at TARGET LOCATION ONE.

  E.     HISTORY OF MARIJUANA CULTIVATION AT WU'S PROPERTIES

36.    Tony WU has been suspected by law enforcement of cultivating marijuana in the past.  On October 19, 2018, Montrose County Sheriff's Office Deputy D. Horn, responded to TARGET LOCATION TWO, to post a distraint warrant on the front door of the residence.  This property was purchased by Tony WU in April 2016.  WU also owns the adjacent property directly southeast of this property, TARGET LOCATION THREE.  WU purchased the property

at TARGET LOCATION THREE in September of 2016.  These two properties share a common driveway.  While Deputy Horn was serving the distraint warrant, he observed large quantities of suspected marijuana on both properties.  Deputy Horn obtained search warrants for both properties on October 19, 2018.  As a result of the execution of those search warrants, over 2,000 pounds of marijuana was seized from the properties.  Deputy Horn contacted three people on the properties, identified as Sang HO, Shanggui TANG and Shiwei LIU.  LIU informed Deputy Horn that they had all been living and working at the two properties for the past 6 months, but did not say whom they were working for.  HO, TANG and LIU were all criminally charged for cultivating the marijuana found on the properties (Montrose County Sheriff's Office incident S18-14839).  All three cases are still pending judicial process at this time.

37.     On October 30, 2018, Montrose County Sheriff's Office Investigator G. Hill, contacted John Maurer, who resides at 16222 6900 Road Montrose, Colorado.  Maurer's residence is directly west of the properties owned by Tony WU.  Maurer told Inv. Hill that he met WU near the beginning of October 2018 and WU introduced himself as the owner of the property next to Maurer's property.  He advised WU was driving a red, full sized truck when he spoke with WU and he had seen that same truck at the properties on Orion Trail (TARGET LOCATION TWO and THREE), on multiple occasions in the recent past.

38.     On November 1, 2018, Inv. Hill went to TARGET LOCATION ONE, to try to speak with Tony WU.  When Inv. Hill arrived at the residence, he was not able to contact anyone.  Inv. Hill advised he observed the access door to the garage was open, and he observed grow lights and fans in the garage similar to the grow operation at Orion Trail.  Inv. Hill also observed what appeared to be an old marijuana grow to the east of the residence.  WU was never criminally charged for any of the marijuana grows that were found on his properties.

39.      At the onset of this investigation Agent Farmer looked up the addresses of Tony

WU's properties, to gather information.  While looking at images on both Google Earth and the

Montrose County GIS website, Agent Farmer was able to see what is believed to be, based on

training and experience, evidence of past outdoor marijuana grows which were present at the

properties during the time when the satellite images were taken for their respective websites.

The satellite images show the infrastructure for marijuana grows, such as water lines, water

tanks, and uniform disturbances in the soil.  Attached are images from Google Earth and

Montrose County GIS.  As noted above WU has been the DMEA account holder of TARGET

LOCATION ONE since January 2017.  WU has been the DMEA account holder of TARGET

LOCATION TWO since April of 2016, and he has been the DMEA account holder of TARGET

LOCATION THREE since May of 2018.



Montrose County GIS – TARGET LOCATION ONE
Image from 03/10/2016 (before WU purchased the property).



Montrose County GIS – TARGET LOCATION ONE
Image from 04/22/2018.



Google Earth – TARGET LOCATION ONE
Image from 08/25/2019.



Montrose County GIS – TARGET LOCATION TWO
Image from 03/30/2018 (approximately 7 months before 10/19/18 search warrant execution)



Google Earth – TARGET LOCATION TWO
Image from 08/25/2019.



Montrose County GIS – TARGET LOCATION THREE
Image from 03/29/2018 (approximately 7 months before 10/19/18 search warrant execution).



Google Earth – TARGET LOCATION THREE
Image from 08/25/2019.

     F.     <u>WAGE SURVEY OF TONY WU AND MOON WU</u>

38.     On January 16, 2020, a wage survey was conducted on Tony WU and Moon WU to see what income they have reported to the Colorado Department of Revenue for tax purposes. Tony WU reported income in all four quarters of 2016, and in the first three quarters of 2017. Tony WU has no reported income in 2018 or 2019.  Tony WU's total reported income in 2016 was exactly $44,000.  Tony WU's total reported income in 2017 was exactly $26,000.  Tony WU's only listed employer is Panda Palace, which is a Chinese restaurant in Montrose, Colorado.  Moon WU has no reported income to the State of Colorado.

## SEARCH OF ELECTRONIC MEDIA

39.     In this affidavit, the terms computers, or digital storage media or devices are intended to include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, network hardware, hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical storage media.

40.     I submit that if computers or storage media are found at the areas described above and in Attachment B, there is probable cause to search and seize those items for the reasons stated below.  Some of these electronic records might take the form of files, documents, and other data that is user generated.  Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.  I am aware that modern cellular telephones, or smart phones, operate in many respects as a computer, with internet access, and function at times as a person's computer historically would have.

41.     Based on my and my colleagues' knowledge, training, and experience, I know that a powered-on computer maintains volatile data.  Volatile data can be defined as active information temporarily reflecting a computer's current state including registers, caches, physical and virtual memory, network connections, network shares, running processes, disks, and printing activity.  Collected volatile data may contain such information as opened files, connections to other computers, passwords used for encryption, the presence of anti-forensic tools, or the presence of programs loaded in memory that would otherwise go unnoticed.  Volatile data and its corresponding evidentiary value is lost when a computer is powered-off and unplugged.

42.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in unallocated space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

43.     Also, again based on my training and experience, wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from

operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information. Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

44.     As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how electronic devices were used, the purpose of their use, who used them, and when.

45.     The analyst needs all assisting software (operating systems or interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instructional manuals or other documentation and security devices. Moreover, searching computerized information for evidence or instrumentalities of crime commonly requires the seizure of the entire computer's input/output periphery devices (including related documentation, passwords and security

devices) so that a qualified expert can accurately retrieve the system's data in a controlled
environment.

46.     "User attribution" evidence can also be found on a computer and is analogous to
the search for "indicia of occupancy" while executing a search warrant at the location described
in Attachment A.  For example, registry information, configuration files, user profiles, e-mail, e-
mail address books, "chat," instant messaging logs, photographs, videos, and correspondence
(and the data associated with the foregoing, such as file creation and last accessed dates) may be
evidence of who used or controlled the computer or storage medium at a relevant time.  Further,
in finding evidence of how a computer was used, the purpose of its use, who used it, and when,
sometimes it is necessary to establish that a particular thing is not present on a storage medium.
For example, the presence or absence of counter-forensic programs or anti-virus programs (and
associated data) may be relevant to establishing the user's intent.

47.     I know from training and experience that digital software or hardware exists that
allows persons to share digital access over wired or wireless networks allowing multiple persons
to appear on the Internet from the same IP address.  Examination of these items can reveal
information about the authorized or unauthorized use of Internet connection at the locations.

48.     Searching computer(s) for the evidence described in the attachment may require a
range of data analysis techniques.  For example, information regarding user attribution or
Internet use is located in various operating system log files that are not easily located or
reviewed.  Or, a person engaged in criminal activity will attempt to conceal evidence of the
activity by "hiding" files or giving them deceptive names.  As explained above, because the
warrant calls for records of how a computer has been used, what it has been used for, and who
has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to

obtain evidence, including evidence that is not neatly organized into files or documents.  Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant.  Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space.  This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

49.     Based upon my knowledge, training and experience, I know that a thorough search for information stored in storage media often requires agents to seize most or all storage media to be searched later in a controlled environment.  This is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  Additionally, to properly examine the storage media in a controlled environment, it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the controlled environment.  This is true because of the following:

a.     The nature of evidence.  As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.  Also, because computer evidence is extremely vulnerable to tampering and destruction (both from external sources and from code embedded in the system as a "booby-trap"), the controlled environment of a laboratory is essential to its complete and accurate analysis.

b.      The volume of evidence and time required for an examination.  Storage media can store the equivalent of millions of pages of information.  Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names.  This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.  As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Reviewing information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

c.      Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

d.      Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

e.      Need to review evidence over time and to maintain entirety of evidence.  I recognize the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches.  I advise it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis.  I have learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops.  In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole.  Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed.  The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum.  Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original.  In the past, I have reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations.  I have learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained

therein, and to determine whether it is within the scope of the items sought in Attachment B. In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation. As such, I respectfully request the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time. As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

50. Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for would permit seizing or imaging storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later and perhaps repeated examination consistent with the warrant. The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

51. Because several people may share the area described in this affidavit, it is possible that the area will contain computers that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that it is possible that the things

described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

52.     I know from training and experience that digital storage devices can be very large in capacity, yet very small in physical size.  Additionally, I know from training and experience that those who are in possession of such devices also tend to keep them on their persons, especially when they may contain contraband or other evidence of a crime.  The storage capacity of such devices can be as large as tens of gigabytes in size as further described below, which allows for the storage of thousands of images and videos as well as other digital information such as calendars, contact lists, programs, and text documents.  Such storage devices can be smaller than a postage stamp in size, which allows them to be easily hidden in a person's pocket.

## REQUEST FOR USE OF INVESTIGATIVE AND PROTECTIVE ACTIVITY

53.     Contemporaneous with the execution of the warrant sought in this application, I request authorization for law enforcement to use an electronic technique to disrupt Wi-fi service at the TARGET LOCATIONS on the date of execution of the requested warrant, prior to and during execution of the warrant.

54.     The TARGET LOCATIONS are in remote locations and it is difficult to determine what type of wireless technology is utilized at the property.  However, based on surveillance, including the presence of equipment that can be operated remotely, agents believe that wireless and remote surveillance systems are likely in place at the properties.  Additionally, based on my training and experience, it is common for indoor marijuana grow locations to have a surveillance system in place.  These surveillance systems typically consist of multiple cameras, alarms, and a DVR-type storage system.  Furthermore, there is very little, if any, cellular

coverage in these locations.  Accordingly, I believe that the occupants of these locations likely utilize Wi-fi calling to communicate.

55.     Use of Wi-fi-enabled security devices by the occupants of the TARGET LOCATIONS could enable those occupants to know, in advance of search warrant execution, that law enforcement officials are approaching the premises.  Similarly, occupants of one location could notify others, utilizing Wi-fi calling, before law enforcement is able to arrive and secure the area.  This may provide the occupants an opportunity to flee, destroy or tamper with evidence, and could otherwise endanger the safety of officers executing the requested warrant. While firearms have not been observed at the TARGET LOCATIONS during surveillance, I know from my training and experience that firearms are frequently possessed by drug traffickers, particularly those operating in remote locations, in order to protect their product and/or the proceeds derived from their illegal conduct.  Additionally, during searches of similar operations conducted in Western Colorado, large caches of weapons have been located.

56.     In order to mitigate risk, I request authority to use the electronic technique discussed above as an authorized investigative or protective activity, pursuant to Title 18, United States Code, Sections 1029(f) and 1030(f).  Use of this electronic technique may interrupt wireless connections for non-target devices within the immediate vicinity of the TARGET LOCATIONS.  Any service disruptions to non-target devices will be brief and temporary, and law enforcement will limit such disruptions to the extent possible, while ensuring officer safety

## **CONCLUSION**

57.     Based on the above described events, I submit that there is probable cause to believe that the TARGET LOCATIONS listed in Attachment A are being used to manufacture, store, and sell illegal controlled substances in violation of Title 21, United States Code, Sections

841(a)(1) and 846.

58.     I further submit that there is probable cause to believe that: (1) evidence of such crimes, (2) contraband, fruits of crime, or other items illegally possessed, and (3) property designed for use, intended for use, or used in committing a crime will be located at the **TARGET LOCATIONS**.

59.     Finally, in conjunction with the execution of the search warrant, I submit there is good cause to utilize an investigative or protective activity to disrupt Wi-fi service at the TARGET LOCATIONS on the date of execution of the request warrant, prior to and during the execution.

60.     WHEREFORE, I respectfully request a search warrant for the TARGET LOCATIONS, including all out buildings, detached garages and vehicles located on the curtilage on the properties.

_s/ Blake McClellan_
Blake McClellan
Task Force Officer
Drug Enforcement Administration

Subscribed, attested to, and acknowledged by reliable electronic means on the __29__ day of May, 2020.

_____
Gordon P. Gallagher
United States Magistrate Judge

**Reviewed and submitted by AUSA Jeremy Chaffin.**

**ATTACHMENT A**
**DESCRIPTION OF PROPERTIES TO BE SEARCHED**

**TARGET LOCATION TWO:  69300 Orion Trail, Montrose, Montrose County, Colorado**,

is a single family, one story home with a detached garage, which is located to the west of the

main residence.  The house sits on 28.39 acres of land.  The residence has light blue or white

colored siding with similar colored trim, and a white colored metal roof.  The Montrose County

Assessor's Office website states that the main residence is approximately 2,082 square feet,

contains 3 bedrooms and 1.5 bathrooms, and it was constructed in 1950.  The location to be

searched includes all persons, vehicles, and outbuildings on the property.



## ATTACHMENT B

### DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED

Evidence, fruits, and/or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846, to include:

1. Controlled substances, including, marijuana.

2. Any vessels or other implements used in connection with the production, packaging, weighing, storage, transport, or distribution of such controlled substances.

3. Any substance used to mix into controlled substances in order to create a larger volume. Such substances are commonly referred to as "cut."

4. Items used for the cultivation and processing of marijuana, including marijuana seeds, scissors, drying racks, nutrient reservoirs, PVC/poly pipes, hand or backpack sprayers, watering devices, growing mediums, liquid and powder nutrients, fertilizers, potting soil, pots, fungicides, insecticides, herbicides, pruning shears, irrigation supplies (including tubing, connectors, emitters, etc.), shovels and/or other gardening tools, generators, pumps, and marijuana cultivation manuals.

5. Books, receipts, notes, invoices, charge card and/or credit card statements and summaries, bank statements, records, correspondence, controlled substance customer or supplier lists, growing schedules, logs, journals, contracts, shopping lists for food and supplies, letters, phone records, phone books, address books, notations and other papers, and any files or records relating to the cultivating, transporting, selling, storing, ordering, purchasing or distributing of controlled substances.

6. Indicia related to occupancy, residency or ownership of property, premises, or vehicles, including, purchase or lease agreements, titles, keys, and mail envelopes.

7. Weapons, firearms, and items used in conjunction with weapons or firearms, including magazines, ammunition and means of carrying or concealment and records or receipts pertaining to weapons, firearms and ammunition.

8. Financial records, including expenses incurred in obtaining the equipment and items necessary for the cultivation and/or distribution of controlled substances, income derived from the sales of controlled substances, pay-owe sheets, records of legitimate income (to serve as a baseline to discern excess or unexplained income consistent with proceeds derived from drug trafficking) and general living expenses.

9. United States currency, precious metals, jewelry and financial instruments, including mortgage notes, stocks, and/or bonds representing drug proceeds.

10. Books, records, invoices, receipts, records of real estate transactions, bank statements, and related records, certificates of deposits, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, correspondence, safe deposit keys, money wrappers, and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money.

11. Computers, cellular telephones, and/or portable telephones, pagers, and any stored electronic communications contained therein.

12. Devices used to communicate with other individuals involved in the manufacture and distribution of marijuana or any other controlled substance, including cellular telephones, radios, pagers, beepers and devices used to conduct counter surveillance against law enforcement, including scanners, surveillance cameras, night vision devices, FLIR devices, monitors, motion sensors and/or alarms, recording devices and/or receipts or literature describing the same.

13. Address and/or telephone books (written or typed by hand as opposed to printed commercially), indices and any papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers of co-conspirators, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists.

14. Photographs and digital images, including still photos, negatives, videotapes, films, undeveloped film and the contents therein, slides, in particular, photographs of co-conspirators, of assets and/or controlled substances.

15. Assigned telephone number for any and all telephone, cell phones and pagers found in the area, along with telephone toll records, papers, notebooks and other items documenting the purchase, acquisition or distribution of marijuana or any other controlled substance, and communications among co-conspirators.

16. For the electronic devices (hereinafter COMPUTERS):

   a. evidence of who used, owned, or controlled the COMPUTERS such as logs, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, user profiles, e-mail, e-mail contacts, "chat" or instant messaging logs, photographs, and correspondence;

   b. evidence of software that may allow others to control the COMPUTERS, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c. evidence of the lack of such malicious software;

d. evidence of the attachment to the COMPUTERS of other storage devices or similar containers for electronic evidence;

e. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTERS;

f. evidence of the times the COMPUTERS were used;

g. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTERS;

h. evidence indicating how and when the COMPUTERS were accessed or used to determine the chronological context of computer access, use, and events relating to the crime under investigation and to the computer user;

i. contextual information necessary to understand the evidence described in this attachment;

j. volatile data necessary to preserve evidence prior to powering-off and unplugging a running computer.

k. Records and information, including texts, emails, photographs, or videos of or about controlled substances or people possessing, obtaining, distributing, or using controlled substances or holding firearms;

l. records of or information about the COMPUTERS' Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m. information, notes, documents, records, or correspondence, in any format and medium, pertaining to violations of Title 21, United States Code, Sections 841(a)(1).

n. items otherwise described in this attachment but contained on an electronic device of any sort.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, DEA may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

DEFINITIONS:

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as film, prints, videos, or photocopies).

As used above, the terms "computers" or "digital storage media" are intended to include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, network hardware, hard disks, RAM, flash memory, and other electronic storage media.

## USE OF INVESTIGATIVE OR PROTECTIVE ACTIVITY

This warrant authorizes officers to use an electronic technique to disrupt Wi-fi service to the locations identified in ATTACHMENT A on the date of execution of the warrant, prior to and during execution of the warrant.  This technique is a lawfully authorized investigative or protective activity, pursuant to Title 18, Unite States Code, Sections 1029(f) and 1030(f). Officers must use reasonable efforts to ensure any service disruptions to non-target devices are brief and temporary, and to limit such disruptions to the extent possible, while ensuring officer safety.